**In re the Matter of STATE of Delaware**

v.

**Jeremy M. WOOD.***

**Nos. 0611015092, 0611004732.**

Family Court of Delaware.

Submitted: Jan. 5, 2007.
Decided: March 13, 2007.

Carole Davis, Georgetown, DE, for the State of Delaware.

* Pseudonyms are used to protect the privacy of the parties

Dean C. Johnson of the office of the Public Defender, Georgetown, DE, for the defendant.

## OPINION

HENRIKSON, J.

On January 5, 2007, the Court held a trial on the pending criminal charges against Jeremy M. Wood, the defendant, who was 13 at the time the alleged events took place. For conduct allegedly occurring on November 6, 2006, the defendant faced charges of Disorderly Conduct in violation of 11 Del.Code, § 1301, Criminal Mischief Less Than $1000 in violation of 11 Del.Code, § 811, and Offensive Touching in violation of 11 Del.Code, § 601. For conduct allegedly occurring on November 12, 2006, the defendant faced the charge of Offensive Touching in violation of 11 Del. Code, § 601.

Attending the hearing were Trenee Parker of the Division of Family Services, noting that DFS has custody of this child; Adair Williams, Seaford House supervisor; Pat White of Child Mental Health; John Stillman of Seaford House; and Nicole Topper, Court Liaison. Carole Davis, Esquire, represented the office of the Attorney General. Dean C. Johnson, Esquire, of the office of the Public Defender, represented the defendant.

## FACTS

John Stillman works as a house counselor at Seaford House in Seaford, Delaware, which houses troubled children from ages 12 through 17. At his job as a house counselor, Mr. Stillman teaches the children life and educational skills. The defendant was admitted to Seaford House on September 14, 2006.

Seaford House has a points system which tabulates each child's good and bad behavior at the end of each day. On November 6, 2006, the defendant did not make the number of points to qualify him as having a successful day. According to Mr. Stillman, the defendant then "flipped out" by cussing, yelling, screaming, and throwing things. The defendant then went to his room and slammed his bedroom door hard enough so that the door knob placed an 8–10 inch hole in the drywall. The defendant was asked to leave his room, and he threw a shoe at Mr. Stillman, striking him in the left leg. Mr. Stillman then escorted the defendant out of his room and into the hallway. When Mr. Stillman was asked about his feelings about these incidences, he stated that the defendant tends to over-react to things. Mr. Stillman stated that he had a concern that the defendant might hit Mr. Stillman or go outside where the defendant might hurt himself.

Sergeant Tom Lecates of the Seaford Police Department testified that he was called to Seaford House on November 6, 2006. He observed that the defendant was calm when he appeared on the scene. Sergeant Lecates also observed the damage testified to by Mr. Stillman. Sergeant Lecates estimated the damage to the drywall at approximately $100 in value.

On November 12, 2006, Mr. Stillman described how the defendant was throwing chairs in the dining room. When Mr. Stillman attempted to restrain the defendant so that the defendant would not harm himself or others, the defendant kicked Mr. Stillman in the leg. Mr. Stillman indicated he suffered no injury.

Mr. Stillman testified to his awareness that the defendant had been diagnosed with ADHD and possibly two other disorders. Mr. Stillman's testimony also indicated he was aware of defendant having a history of having been an abused child. He described the defendant as often having temper tantrums, which include yelling, screaming, acting disrespectful, and throwing things, such as pencils, books, and chairs.

Mr. Stillman noted that the defendant could behave if he had something to look forward to, or he might behave if he was told he was going to be restrained with a basket hold. According to Mr. Stillman, the defendant has to have the Seaford House rules explained to him 5 out of 7 days every week. Fairly recently, the defendant was able to behave sufficiently from Monday through Thursday so he would qualify to attend a movie. However, as soon as he returned home from the movie, the defendant misbehaved.

Mr. Stillman concluded his testimony noting that the defendant is a "very good kid" who can behave if he chooses to. The Court could not help but notice that the defendant's attention perked up as Mr. Stillman commented on what a good child the defendant could be.

The defendant is an average size 13 year old male. Mr. Stillman is 33 years old and weighs close to 400 pounds.

At the conclusion of the State's case, the defense counsel made an Oral Motion for a Directed Verdict. Defense counsel was given 10 days to file a Memorandum of Law in support of his Motion, and the State then has 10 days thereafter to respond. The Court reserved its decision on the Motion for Directed Verdict.

The defense thereafter rested its case and counsel for the State and defendant gave their closing arguments.

### LAW AND REASONING

Through defense counsel's Motion for a Directed Verdict and supporting memorandum, defendant argues that under the common-law defense of infancy, there is a rebuttable presumption that he is incapable of committing a criminal act. Defendant submits that the State did nothing to rebut this presumption and, as such, the Court should grant defendant's Motion for a Directed Verdict of an acquittal.

Based upon the reasoning that follows, the Court rules that the infancy defense is not a valid defense in a juvenile delinquency proceeding, and, accordingly, defendant's Motion for Directed Verdict must be denied. Further, the Court finds that the evidence presented at trial supports a verdict of guilty for two counts of offensive touching, one count of criminal mischief, and one count of disorderly conduct.

### Infancy Defense Prior to Juvenile Courts

Prior to the creation of juvenile courts, young children were shielded from criminal responsibility by virtue of the common-law doctrine of *doli incapax*.[1] Otherwise known as the infancy defense, the doctrine created a conclusive presumption that a child under the age of seven was incapable of committing a crime. In regard to children between the ages of seven and 14, there existed a rebuttable presumption that the child could not commit a crime, and the presumption weakened as the child approached age 14. After age 14, a child was presumed capable of criminal acts.[2]

 It is important to note, that the *doli incapax* doctrine differs from the similar yet distinct concept of *mens rea*. The former addresses an individual's capacity to appreciate right from wrong whereas the latter determines whether or not a defendant acted with the necessary criminal intent.[3] The Supreme Court of Connecticut described the distinction in *In re Tyvonne*:[4]

---

1. 21 Am.Jur.2d *Criminal Law* § 35 (1998).

2. *Id.*

3. *In re Tyvonne*, 211 Conn. 151, 558 A.2d 661 (1989).

4. *Id.*

The common law defense of infancy, like the defense of insanity, differs from the criminal law's requirement of "mens rea" or criminal intent. The law recognized that while a child may have actually intended to perform a criminal act, children in general could not reasonably be presumed capable of differentiating right from wrong. The presumptions of incapacity were created to avoid punishing those who, because of age, could not appreciate the moral dimensions of their behavior, and for whom the threat of punishment would not act as a deterrent.[5]

Therefore, at common law a child was capable of acting with recklessness, intent, malice, etc., but punishing these acts did not serve a fundamental aim of the criminal justice system: deterrence. However, with the establishment of juvenile court systems—and their focus on remedial rather than punitive consequences—the theoretical underpinnings of the defense no longer applied to the nature of the proceedings. As a result, most states that have addressed the infancy defense in the context of a juvenile delinquency case have held that the doctrine has been implicitly repealed by the legislature's decision to create a separate court system for adults and juveniles.[6]

### Infancy Defense in a Delaware Delinquency Proceeding

Delaware has yet to address whether or not *doli incapax* is a viable defense in a juvenile delinquency proceeding. Defendant argues that it is. Specifically, defendant argues that the defense was available in this State prior to the creation of the Family Court, and, further, that the differences in a Family Court juvenile delinquency proceeding and an adult criminal proceeding have eroded to the point that the distinction between the two is a legal fiction. Defendant also submits that the Delaware legislature has implicitly recognized the infancy defense by setting minimum ages for certain offenses for which a juvenile may be tried or sentenced as an adult. Finally, defendant argues that denying the infancy defense would violate defendant's due process rights.

■ The Court is satisfied that *doli incapax* does not apply to a juvenile delinquency proceeding. Most jurisdictions have held that the defense of infancy is contrary to the legislative intent behind the creation of a juvenile court system.[7] In addressing this issue on an appeal of a juvenile delinquency adjudication, the Superior Court of Pennsylvania looked to the intent of the infancy defense and the legislative intent behind the creation of Pennsylvania's juvenile justice system.[8] Having found that the legislature created the juvenile court system for the purpose of ensuring that children would not be treated as criminals, the Court ruled that the infancy defense was implicitly repealed for the purposes of a delinquency proceeding.[9]

Turning to the intent behind the creation of Delaware's Family Court, one is led to the same conclusion. Title 10, Chapter 9 of the Delaware Code sets forth the jurisdiction and purpose of this Court. Section 1002 of the Code provides as follows:

§ 1002. **Delinquent child not criminal; prosecution limited.**

Except as provided in § 1010, no child shall be deemed a criminal by virtue of an allegation or adjudication of delinquency, nor shall a child be charged with

---

**5.** *Id.* at 664.

**6.** *Id.* at 666 (citations omitted).

**7.** *Id.*

**8.** *In the Interest of G.T.,* 409 Pa.Super. 15, 597 A.2d 638 (1991).

**9.** *Id.* at 642.

or prosecuted for a crime in any other court. In this Court the nature of the proceedings shall be in the interest of rather than against the child.[10]

The plain language of § 1002 indicates that a child is free of criminal liability except for specified exceptions where a child can be tried as an adult. Since the *doli incapax* doctrine was created to prevent punishing those who cannot appreciate the deterrent effect of the criminal justice system, the Court is satisfied that the doctrine has been supplanted by the creation of the Family Court's juvenile delinquency jurisdiction.

Defendant argues that the civil, rehabilitative nature of a juvenile delinquency proceeding is a legal fiction because there is no significant difference between an adult criminal proceeding and a juvenile delinquency proceeding. To support this contention, defendant cites the landmark case of *In re Gault*, where the U.S. Supreme Court held that a child in a juvenile delinquency trial is entitled to many of the same procedural safeguards given to an adult in a criminal proceeding.[11] Defendant contends that the systems are now nearly identical from a procedural standpoint and, accordingly, any justification for not allowing the infancy defense has been ameliorated. To support this assertion, defendant points to the fact that the Court often finds a child guilty or not-guilty and frequently refers to the child as a defendant. In essence, the defendant argues that for the purposes of a juvenile delinquency proceeding, the Family Court is a *de facto* criminal court.

Although it is true that the juvenile justice system as a whole has drawn much criticism because of its increasing similarity to the criminal justice system,[12] it is not this Court's role to supplant the judgment of the legislature by resurrecting a common-law doctrine that has been supplanted by the statutory scheme behind the creation of the Family Court. Such a decision is in the realm of policy makers, and the principle of judicial restraint prevents the Court from attempting to correct alleged systemic flaws were it inclined to do so.

Further, the Court cannot agree with defendant's assertion that the substantive differences between the juvenile and criminal justice systems have been negated by their similarity in procedure, terminology and semantics. Since the Supreme Court announced *Gault*, the appearance of a criminal and juvenile proceeding have, indeed, become quite similar.[13] However, arguing that this superficial resemblance eliminates the distinct roles of the two systems ignores the significant differences in sentencing a juvenile delinquent compared with sentencing an adult criminal.[14]

The Delaware Code grants broad sentencing discretion to this Court in order to address the individual needs of delinquent children.[15] Section 1009(c) of the Code provides the Court with 17 enumerated options upon finding a child delinquent. These options include a diverse range of possibilities such as permitting the child to stay at home without Court supervision, ordering the child to pay restitution, com-

---

**10.** Del.Code Ann. tit. 10, § 1002 (1999).

**11.** *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

**12.** See Generally, David Yellen, *What Juvenile Court Abolitionists Can Learn From the Failures of Sentencing Reform*, 1996 Wis. L.R. 577 (1996).

**13.** *Id.* at 591.

**14.** *Id.* at 597–598.

**15.** Del.Code Ann. tit. 10, § 1009(c) (1999 & Supp.2006).

mitting a child to a mental health facility, and awarding custody of the child to the Department of Services for Children, Youth and Their Families.[16] Therefore, under *Gault* a juvenile delinquency procedure is analogous to a criminal procedure, but in Delaware, at least, this analogy ends at the sentencing stage. Broad sentencing discretion furthers the non-punitive, rehabilitative aims behind the juvenile proceeding. As such, the protections previously offered to a child via the doctrine of *doli incapax* have been replaced by this Court's focus on the child's best interest at the sentencing stage of a delinquency proceeding.

Defendant also submits that the Delaware Legislature has implicitly recognized the infancy defense. Having already found that the legislative intent behind creating the Family Court has implicitly supplanted the infancy defense, the Court need not address the merits of this portion of defendant's argument.

Finally, defendant argues that denying the infancy defense would violate defendant's due process rights. Defendant argues that since the doctrine has been part of the common law for more than 800 years, not allowing the defendant to assert it would offend a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[17]

The Court finds this claim to be without merit. It is true that the infancy defense has been part of the common law system for centuries. However, it has existed in the context of a criminal proceeding not in the relatively recent creation of juvenile courts. It cannot be said, then, that the defense is a fundamental part of the juvenile justice system. To the contrary, the majority of jurisdictions that have addressed the issue have held that the defense has no place in a delinquency proceeding.

For the forgoing reasons, the Court rules that the infancy defense does not apply to a Family Court delinquency proceeding. The prosecution had no burden to overcome a presumption that the defendant was incapable of committing a crime. As such, the defendant's motion for a directed verdict on the grounds of the infancy defense is hereby denied.

### Criminal Charges

■ Having determined that the defense of infancy was not available to defendant in this trial, the Court turns to whether or not the evidence submitted at trial supports the charges upon which the delinquency petition was filed.

### Offensive Touching

The Delaware Code defines offensive touching—an unclassified misdemeanor—as follows:

> (a) A person is guilty of offensive touching when the person:
>
> (1) Intentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person;[18]

The evidence in this case demonstrated that on November 6, 2006 the defendant intentionally threw a shoe at Mr. Stillman and the shoe struck him in the left leg. The evidence also demonstrated that on November 12, 2006 the defendant was throwing chairs in the dining room of the

---

**16.** *Id.*

**17.** Defendant's brief at page 7 (quoting *Medina v. California,* 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).

**18.** Del.Code Ann. tit. 11, § 601(a)(1) (1999).

Seaford House, and when Mr. Stillman attempted to intervene the defendant intentionally kicked him in the leg.

The Court is satisfied that defendant's actions satisfy the requirements for the violation of offensive touching, and the Court hereby finds defendant guilty on both counts.

### Criminal Mischief

 The Delaware Code defines criminal mischief as follows:

(a) A person is guilty of criminal mischief when the person intentionally or recklessly:

(1) Damages tangible property of another person; [19]

Criminal mischief that causes less than $1,000 in damages is an unclassified misdemeanor.[20] Further, the term "person" includes incorporations, unincorporated associations, partnerships or government entities.[21]

The evidence in this case demonstrated that on November 6, 2006 the defendant slammed his door hard enough to create an 8–10 inch hole in the wall of Seaford House, causing less than $1,000 damage to the property of Seaford House.

The Court does not find that the defendant intentionally damaged the property. However, the Court is satisfied that defendant recklessly damaged the property and hereby finds defendant guilty of the unclassified misdemeanor of criminal mischief.

### Disorderly Conduct

 The Delaware Code defines disorderly conduct—an unclassified misdemeanor—as follows:

A person is guilty of disorderly conduct when:

(1) The person intentionally causes public inconvenience, annoyance or alarm to any other person, or creates a risk thereof by: [22]

a. Engaging in fighting or in violent, tumultuous or threatening behavior; or

b. Making an unreasonable or an offensively coarse utterance, gesture or display, or addressing abusive language to any person present;

The Code further explains that a public place includes facilities such as prisons and schools,[23] which are not open to the general public but nonetheless contain groups of unrelated individuals. The Court finds that a residential treatment center falls within the scope of the disorderly conduct statute and, further, that defendant intentionally caused public inconvenience, annoyance or alarm by cussing, yelling, screaming, and throwing things while at Seaford House. The Court, therefore, finds defendant guilty of disorderly conduct.

For the forgoing reasons the Court finds that the evidence presented at trial supports a verdict of guilty for two counts of offensive touching, one count of criminal mischief, and one count of disorderly conduct. Sentencing in this matter shall be scheduled for April 18, 2007, at 9:00 a.m.

**IT IS SO ORDERED.**

---

19. DEL.CODE ANN. tit. 11 § 811(a)(1) (1999).

20. DEL.CODE ANN. tit. 11 § 811(b)(3) (1999).

21. DEL.CODE ANN. tit. 11 § 222(20) (1999).

22. DEL CODE ANN. tit. 11 § 1301 (1999).

23. DEL.CODE ANN. tit. 11 § 1337(a) (1999).